No. 25-5641

UNITED STATES COURT OF APPEALS
*for the*
NINTH CIRCUIT

RODERICK E. THEIS, II,
*Plaintiff and Appellant*,

v.

INTERMOUNTAIN EDUCATION SERVICE DISTRICT
BOARD OF DIRECTORS et al.,
*Defendants and Appellees*.

On Appeal from the United States District Court
*for the*
District of Oregon
(Case No. 2:25-cv-00865-HL)

---

**Defendants and Appellees'
Answering Brief**

---

Janet M. Schroer
jms@hartwagner.com
Blake H. Fry
bhf@hartwagner.com
HART WAGNER LLP
1000 SW Broadway, 20th Floor
Portland, Oregon 97205
(503) 222-4499 | fax (503) 222-2301
*Attorneys for Defendants and Appellees*

December 1, 2025

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................v

STATEMENT OF ISSUES PRESENTED FOR REVIEW ......................1

STATEMENT OF JURISDICTION ........................................................1

STATEMENT OF THE CASE.................................................................1

I      Factual background.......................................................................1

II     Procedural history.........................................................................8

SUMMARY OF ARGUMENTS..............................................................10

I      The plaintiff, a public employee, is unlikely to succeed
on a free speech claim against his public employer .....................10

II     The employee is unlikely to succeed on a
free exercise claim against his employer .....................................12

III   The employee is unlikely to succeed on a
due process claim against his employer ......................................14

ARGUMENT AND AUTHORITY .........................................................14

I      The district court acted within its discretion to deny
the motion for a preliminary injunction because
the plaintiff is not likely to succeed on his free speech claim .......15

      A     The plaintiff, a public employee, is not likely
to succeed because the defendant, his
employer and a public educator, merely barred
him from continuing discriminatory conduct .......................16

            1     The employer barred the employee from
continuing his in-school, discriminatory conduct

i

TABLE OF CONTENTS (*continued*)

under a policy mandated by a state law prohibiting discrimination in education......................16

2    Anti-discrimination laws or regulations do not implicate the First Amendment just because their application to bar discriminatory conduct might burden speech incidentally..................18

B    Even if the First Amendment were implicated, an employer may bar discriminatory rhetoric without raising any constitutional concern deserving of further consideration.......................................20

1    The employee offered his discriminatory rhetoric in his capacity as a public employee, rather than as a citizen, because he tried to convey it to students in his school office ................22

2    While the plight of disfavored groups is a matter of public concern, an employee's discriminatory rhetoric against them expresses a purely personal grievance ........................28

3    The discriminatory rhetoric therefore does not rise to a level requiring a court to weigh the employee's speech rights against the employer's interest in preventing its spread.........30

C    Either way, the employer could bar the discriminatory rhetoric because its interest in stopping it outweighs the employee's interest in continuing to spread it to students......................30

1    Under the Pickering balancing test, discriminatory rhetoric which maligns a disfavored, minority group weighs

TABLE OF CONTENTS (*continued*)

nothing because it has no legitimate, social value worth considering.....................................31

2    The employer's interests in restricting "speech" antithetical to its mission to welcome and safeguard all students vastly outweighs the employee's interests in continuing to use it..........33

II   Whether the employee had a right to continue with his discriminatory rhetoric cannot be evaluated under any standard stricter than the *Pickering* balancing test ..............37

A    Discriminatory rhetoric cannot be excused by an employee's free exercise rights just because his discriminatory views about a disfavored group derive from his religious beliefs.............38

1    Barring the employee from spreading discriminatory rhetoric to students did not implicate the Free Exercise Clause because it did not burden any religious practice.........39

2    Regardless, the employee cannot cite his religion to avoid the anti-discrimination policy since it is neutral, generally applicable, and was not applied with any religious hostility ........42

3    Even if the employee had a viable free exercise claim, it would be easily resolved against him following a rational-basis review, or through the Pickering balancing test .........................46

B    Discriminatory rhetoric against a disfavored group cannot be excused just because a public employer would not bar other employees from supporting that group ..........50

iii

TABLE OF CONTENTS (*continued*)

1     The employee never identified other, similarly situated employees whom the employer treated more favorably by allowing them to impugn other disfavored groups......51

2     Even if he did, an employee's constitutional challenge to a public employer's alleged differential treatment of his speech cannot be decided under any test besides Pickering...............52

III   The employee cannot use due process to escape the employer's anti-discrimination policy by feigning ignorance about what constitutes discrimination .........................55

CONCLUSION .......................................................................................59

Certificate of Compliance with Rule 32(a)

iv

# TABLE OF AUTHORITIES

CASES

*Adams v. County of Sacramento,*
 116 F.4th 1004 (9th Cir. 2024)......................................................29

*Alliance for the Wild Rockies v. Cottrell,*
 632 F.3d 1127 (9th Cir. 2011) ......................................................15

*American Family Association, Inc. v.*
 *City and County of San Francisco,*
 277 F.3d 1114 (9th Cir. 2002) ......................................................40

*Arnett v. Kennedy,*
 416 U.S. 134 (1974)........................................................................57

*Berger v. Battaglia,*
 779 F.2d 992 (4th Cir. 1985) ........................................................32

*Berry v. Department of Social Services,*
 447 F.3d 642 (9th Cir. 2006) ................................................. 48, 54

*Bethel School District No. 403 v. Fraser,*
 478 U.S. 675 (1986).......................................................................56

*Blackman v. New York City Transit Authority,*
 491 F.3d 95 (2d Cir. 2007).............................................................31

*Booth v. Pasco County,*
 757 F.3d 1198 (11th Cir. 2014) ....................................................29

*Broadrick v. Oklahoma,*
 413 U.S. 601 (1973).......................................................................56

*Brown v. Chicago Board of Education,*
 824 F.3d 713 (7th Cir. 2016)....................................................56, 57

# TABLE OF AUTHORITIES (*continued*)

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*,
657 F.3d 936 (9th Cir. 2011) ........................................................... 17

*Connick v. Myers*,
461 U.S. 138 (1983) ..................................................... 21, 31, 32

*Craig v. Rich Township High School District 227*,
736 F.3d 1110 (7th Cir. 2013) ............................................. 29, 34, 35

*Damiano v. Grants Pass School District No. 7*,
140 F.4th 1117 (9th Cir. 2025) ....................................................... 54

*Dariano v. Morgan Hill Unified School District*,
767 F.3d 764 (9th Cir. 2014) ..................................................... 50, 54

*Dodge v. Evergreen School District #114*,
56 F.4th 767 (9th Cir. 2022) ......................................................... 26

*Doe v. Snyder*,
28 F.4th 103 (9th Cir. 2022) .......................................................... 15

*Eberhardt v. O'Malley*,
17 F.3d 1023 (7th Cir. 1994) .......................................................... 32

*Employment Division v. Smith*,
494 U.S. 872 (1990) ................................................... 38, 39, 40, 44

*Garcetti v. Ceballos*,
547 U.S. 410 (2006) ................................................................... 21

*Greer v. Amesqua*,
212 F.3d 358 (7th Cir. 2000) .......................................................... 57

*Groyned v. City of Rockford*,
408 U.S. 104 (1972) ................................................................... 56

# TABLE OF AUTHORITIES (*continued*)

*Huppert v. City of Pittsburg,*
    574 F.3d 696 (9th Cir. 2009) ........................................................... 30

*Hurley v. Irish-American Gay, Lesbian & Bisexual*
    *Group of Boston, Inc.,*
    515 U.S. 557 (1995) ......................................................................... 17

*Janus v. AFSCME, Council 31,*
    585 U.S. 878 (2018) ......................................................................... 28

*Johnson v. Poway Unified School District,*
    658 F.3d 954 (9th Cir. 2011) ............................................. 22, 23, 25

*Kennedy v. Bremerton School District,*
    597 U.S. 507 (2022) .............................................................. 25, 47

*Lane v. Franks,*
    573 U.S. 228 (2014) ......................................................................... 28

*Masterpiece Cakeshop v. Colorado Civil Rights Commission,*
    584 U.S. 617 (2018) ......................................................................... 44

*Mayer v. Monroe County Community School Corp.,*
    474 F.3d 477 (7th Cir. 2007) .......................................................... 23

*Melzer v. Board of Education,*
    336 F.3d 185 (2d Cir. 2003) ............................................................ 35

*Monteiro v. Tempe Union High School District,*
    158 F.3d 1022 (9th Cir. 1998) ........................................................ 18

*Moser v. Las Vegas Metropolitan Police Department,*
    984 F.3d 900 (9th Cir. 2021) .................................................. 31, 32

*New York v. Ferber,*
    458 U.S. 747 (1982) ......................................................................... 46

# TABLE OF AUTHORITIES (*continued*)

*Olympus Spa v. Armstrong*,
138 F.4th 1204 (9th Cir. 2025)............................................... 40, 41, 47

*Parents for Privacy v. Barr*,
949 F.3d 1210 (9th Cir. 2020) ................................................. 43, 47

*Pickering v. Board of Education*,
391 U.S. 563 (1968)......................................................................20

*Pleasant Grove City v. Summum*,
555 U.S. 460 (2009)......................................................................46

*Police Department of Chicago v. Mosley*,
408 U.S. 92 (1972).......................................................................50

*R.A.V. v. City of St. Paul*,
505 U.S. 377 (1992)......................................................... 18, 50, 53

*Roberts v. U.S. Jaycees*,
468 U.S. 609 (1984).....................................................................46

*Roe v. City & County of San Francisco*,
109 F.3d 578 (9th Cir. 1997) ................................................. 28, 29

*Rumsfeld v. FAIR, Inc.*,
547 U.S. 47 (2006).......................................................................17

*Stormans, Inc. v. Wiesman*,
794 F.3d 1064 (9th Cir. 2015) ................................................ 42, 43

*Tingley v. Ferguson*,
47 F.4th 1055 (9th Cir. 2022).......................................................43

*Tinker v. Des Moines Independent Community School District*,
393 U.S. 503 (1968)......................................................................54

TABLE OF AUTHORITIES (*continued*)

*United States v. Williams*,
 553 U.S. 285 (2008)...................................................................57

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
 455 U.S. 489 (1982)...................................................................56

*Welch v. Brown*,
 834 F.3d 1041 (9th Cir. 2016) ....................................................43

*Winter v. Natural Resources Defense Council, Inc.*,
 555 U.S. 7 (2008)......................................................................15

*Wisconsin v. Mitchell*,
 508 U.S. 476 (1993)...................................................................17

*Wood v. Florida Department of Education*,
 142 F.4th 1286 (11th Cir. 2025)..................................................26

STATUTES

Or. Rev. Stat. 174.100 ..................................................................2

Or. Rev. Stat. 334.001 ..................................................................2

Or. Rev. Stat. 339.347 ..................................................................2

Or. Rev. Stat. 659.850 ..................................................................1

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

The plaintiff-appellant is employed as a social worker for an educational service district. The district told him to stop trying to spread anti-transgender propaganda to students in his school office. The employee sued, claiming that he had a constitutional right to continue with his efforts. After filing suit, he moved for a preliminary injunction seeking a court order that would allow him to continue. Did the district court act within its discretion in finding that the employee likely had no constitutional right to spread anti-transgender propaganda to students in his office, and in denying the employee's motion for a preliminary injunction accordingly?

## STATEMENT OF JURISDICTION

Defendants accept plaintiff's statement of jurisdiction.

## STATEMENT OF THE CASE

### I   Factual background

Oregon law prohibits discrimination in public education, where *discrimination* is defined to mean "any act that unreasonably differentiates treatment, intended or unintended…based on…gender identity," among other protected traits. Or. Rev. Stat. 659.850. In turn, *gender identity* is defined to mean "an individual's gender-related identity, appearance, expression or behavior, regardless of whether [it] differs from that associated with the gender assigned to the individual at birth." Or.

1

Rev. Stat. 174.100(4). To "comply" with this prohibition against discrimination, public educators "must adopt a policy to address bias incidents." Or. Rev. Stat. 339.347(3). A *bias incident* is defined to mean a "person's hostile expression of animus toward another person, related to the other person's…gender identity." Or. Rev. Stat. 339.347(1). At a minimum, such a policy must "establish procedures for addressing bias incidents" against students, employees, or visitors. Or. Rev. Stat. 339.347(3). These procedures "must apply broadly to include persons directly targeted by an act, as well as the community of students as a whole who are likely to be impacted by the act." *Id*.

The defendants include the InterMountain Education Service District board and several InterMountain officers or employees. An education service district is a district established under Oregon law to provide educational services to school districts in its area. Or. Rev. Stat. 334.001. The services which an education service district provides to school districts are typically those—like special education—that are too costly or limited in demand for any one school district to provide for itself. InterMountain is based in Pendleton. It serves numerous school districts in several counties in rural, eastern Oregon. (ER 80.)

As a public educator, InterMountain has duly adopted the anti-discrimination policy mandated by state law as described above. That policy repeats much of the statutory language. Meanwhile, the policy's implementing regulation details the steps a person "impacted by a bias

2

incident" should take to file a discrimination complaint, and the steps Intermountain should take in responding. (ER 233–37.)

In October 2024, InterMountain received a discrimination complaint about one of its employees from a school district it serves. (ER 239–41, 248–50, 252–54.) Namely, a middle school staff member complained to a school district administrator that an InterMountain employee had, in his office within the school, transphobic books displayed in clear view of where he gave students evaluations. The administrator relayed the complaint to InterMountain, which began the process of responding as detailed in its regulation which implemented the anti-discrimination policy.

The subject of the staff member's complaint was the appellant, Roderick Theis, a social worker employed by InterMountain as an "education specialist." His job in that capacity includes evaluating students who have academic or behavioral needs. To that end, Theis has offices in schools served by InterMountain, including in the school from which the discrimination complaint arose. In that office, Theis sometimes evaluates or otherwise meets with students, and meets with teachers or other school staff. (ER 239–41, 248–50, 252–54.)

Shortly after the school administrator notified InterMountain of the staff member's discrimination complaint, InterMountain alerted Theis. (ER 239–41, 248–50, 252–54.) In doing so, it relayed the substance of the complaint it received, told him that it was investigating

3

the complaint as a potential "bias incident," and sent him the anti-discrimination policy and its implementing regulation.

The books in question include a pair of companion books titled *He is He* and *She is She*, and one titled *Johnny the Walrus*. Each of these are ostensibly children's books in the same vein: they tell children that sex and gender are synonymous and immutable. *He is He* and *She is She* convey this message by depicting the nominal joys of children acting strictly in conformance with the gender typically assigned to their sex at birth. These two books conclude with two sections titled "What Does the Science Say," and "What Does the Bible Say." (ER 6–10.)

The former claims that DNA determines sex and birth, and that DNA "never changes." Regardless of the merits of this pseudo- and half-science, the books miss the point that sex and gender are not the same thing; that gender is determined by culture whatever might decide someone's sex at birth; and that a transgender person is merely someone who does not identify with the gender typically associated with their sex at birth. The latter section includes quotes from religious texts to seemingly again support that "boys and girls" were purposefully made by the Abrahamic god to be different in ways this god did not intend to be changed.

The author of *Johnny the Walrus* is Matt Walsh, a self-described "theocratic fascist," confirmed white supremacist, and propogandist for the *Daily Wire*. But he is probably best known, if he is known at all, for

4

opposing and campaigning against transgender civil rights and, indeed, denying the state of being transgender as a valid mode of human exist-ence.[1] *Johnny the Walrus* is a puerile distillation of Matt Walsh's puerile views.

In *Johnny the Walrus*, published by the *Daily Wire*, the titular character is a boy with a "big imagination" who one day pretends to be a walrus. His mother takes a picture of Johnny pretending to be a walrus and posts it on social media. "Internet people" convince the mother that Johnny is not just *pretending* to be a walrus, he *is* a walrus. So Johnny must eat worms, amputate his feet and implant flippers, and go live in a zoo with other walruses. Except for the amputations, Johnny and the mother do as the "internet people" demand. Eventually Johnny gets tired of being a walrus, and becomes increasingly depressed because things have been taken too far.

Still, the mother takes Johnny to drop him off at a zoo where he can live out his walrus identity. At this moment the story's hero emerges. The zookeeper—a bearded Matt Walsh himself!—tells the mother that Johnny is not really a walrus, he is just boy *pretending* to be a walrus. The mother sees the light, and what had been a fraught sit-uation where everyone was made miserable by "woke" walrus ideology is happily resolved. The message of this allegory is that a person cannot

---

1    The Southern Poverty Law Center keeps a record of Matt Walsh's extreme brand of racism, transphobia, etc., which can be found at splcenter.org/resources/extremist-files/matt-walsh/.

be anything other than the gender typically associated with their sex at birth any more than a boy can become a walrus, and any belief otherwise stems from either a kind of mental illness or received "transgender ideology."

Later in October, several InterMountain administrators and staff met with Theis as part of their investigation. (ER 256–61.) His answers to their questions about what he was doing with the books in his office were inconsistent and disingenuous, to say the least. On the one hand, the books were just "bright" objects he kept in his otherwise dreary office as "decorations" to put students at ease. But on the other hand, he kept the books behind his desk where they could not be seen at all by students. But then again, he kept the books behind his desk to ensure that any student who saw them and wanted to peruse them would do so under his supervision. Also, the books were just "art" which conveyed a positive message. Then again, a student could only discern their supposedly positive message by reading them. And admittedly he would not allow a student he knew was transgender beforehand to read them. And so on.

But the truth was obvious, and in the end the truth revealed itself. Theis kept the books visible hoping that any student in his office would ask about them, thereby giving him an entrée to spread Matt Walsh's views to a young, captive audience. On at least one occasion in the short period Theis had the books on display, he did exactly that: Theis led a

6

discussion about *Johnny the Walrus* and its anti-transgender propaganda with a student in his office.

In late November 2024, InterMountain sent Theis the results of its investigation into the discrimination complaint that had been levied against him and his books. (ER 239–41.) The letter recited the anti-discrimination standards as given by the district's anti-discrimination policy and its implementing regulation.

The letter concluded with a finding that Theis' "display" of the books "for students visiting [his] office for purposes of evaluation and student services" amounted to an act of discrimination in violation of the policy. In particular, the display "constituted a hostile expression of animus toward another person related to their actual or perceived gender identity." The letter also included a "directive" informing Theis that continuing to display the books when students were in the office "may result in discipline."

In early December, Theis appealed the findings and the directive to the district superintendent. (ER 269–81.) The appeal is lengthy, but it basically argued that the books or Theis' use of them with students could not amount to a "hostile expression of animus" since the books looked so cheerful on their surface, and since Theis never directed any hostility *towards* a transgender person themself, and in fact he wished the best for everyone, always. The appeal concluded by objecting that the books were not "transphobic," though in the same breath Theis also

said that "transgenderism" is a "false worldview" that is "harmful to people in general, and especially to children."

In January 2025, InterMountain's superintendent rejected the appeal. (ER 243–46.) He agreed that the books effectively invalidated transgender persons, and therefore that by displaying and discussing the books with students that Theis had "communicated a message of exclusion that contributes to an unwelcoming environment, which directly contradicts InterMountain's commitment to inclusivity and diversity." In short, the superintendent confirmed that it constituted a "bias incident" in violation of the district's anti-discrimination policy and contrary to the district's obligations under Oregon law. He thereby adopted the findings and the directive.

Theis appealed the superintendent's decision to the district's board. In February, the board notified Theis that it had declined to review the superintendent's decision. (ER 294.) That exhausted the internal appeal procedures available to Theis under the anti-discrimination policy's implementing regulation.

## II    Procedural history

Theis filed the underlying suit on May 21, 2025. (District Court Docket Entry Number 1; ER 176–222.) The complaint generally alleges that InterMountain violated his speech rights when it directed him to stop displaying and discussing *Johnny the Walrus* and the other books while students were in his office. The complaint supplements the speech

8

claim with a free exercise claim. That claim is based on allegations that his religious beliefs motivated Theis' anti-transgender views so that InterMountain's directive effectively infringed on his right to religious freedom.

Shortly after filing his complaint, Theis moved for a preliminary injunction. (Docket 12; ER 121–73.) In that motion, Theis asked the court for an order that would allow him to display *Johnny the Walrus* and the other books. He also asked for an order that would remove any reference in his personnel file to the finding that he violated the district's anti-discrimination policy, and the resulting directive.

On August 20, 2025, the district court granted in part, and denied in part, the motion for a preliminary injunction. (ER 2–34.) Specifically, the court enjoined InterMountain from disciplining Theis if he continued to display the books when students were not in his office. (The directive said nothing about whether Theis could display the books when students were not in his office.) But the court found that Theis likely had no right to display the books when a student was in his office. Accordingly, it declined to issue an order that would allow Theis to display the books while a student was in his office, much less to discuss them. The court also declined to order the findings or the directive removed from Theis' personnel file because they were based "on his display of the books when students were present."

This appeal followed. On appeal, Theis challenges the district

9

court's partial denial of his preliminary injunction. That is, Theis challenges the order to the extent that it would still require him to put his books away while a student is in his office, and would likewise still bar him from using the books to lead any discussion with a student.

## SUMMARY OF ARGUMENTS

The plaintiff is a social worker in a public school. His employer has an anti-discrimination policy. That policy prohibits any "bias incident," defined to mean a "hostile expression of animus toward another person" related to a protected trait like gender identity. The employer learned that the social worker displayed and discussed anti-transgender books with students in his school office. The employer deemed this to be a bias incident, and directed him to stop. The social worker sued, making free speech and other claims.

He also filed a motion for a preliminary injunction asking for an order that would allow him to continue using his books with students. The district court denied that motion. The social worker appealed. The district court rightly denied the motion because the social worker is unlikely to succeed on his claims.

**I    The plaintiff, a public employee, is unlikely to succeed on a free speech claim against his public employer**

The goal of any anti-discrimination law, regulation, or policy is to prevent discriminatory *conduct*. Cases accordingly hold that they

cannot be avoided just because the proscribed discrimination might be done through some form of expression. The employer's anti-discrimination policy at issue here is no different from any other. Because any effect the policy had on the social worker's "speech" was incidental to its goal of preventing discrimination, the policy and its application did not implicate the First Amendment. The social worker assumes a difference here because "transgenderism" is politicized. But the targeted group should not matter in deciding whether a regulation prohibiting discrimination can be avoided on free speech grounds.

Even if the anti-discrimination policy implicated the First Amendment, the social worker's free speech claim would be resolved against him by the *Pickering* balancing test. Under this test, a plaintiff first has the burden to show that he spoke 1) as a private citizen as opposed to a public employee 2) on an issue of public concern.

The district court found that the social worker spoke in his capacity as a public employee, not a private citizen, because he offered his anti-transgender books *to students in his school office* who were only there because of the services he was supposed to provide them. That finding was based on this Court's decision in *Johnson v. Poway Unified School District*, a remarkably analogous case. It rejected the social worker's argument that a school employee only acts in that capacity if his speech was directly mandated by his job duties.

For at least two reasons, the social worker's anti-transgender

11

books and their propaganda was not speech on an issue of public concern. One, on its own, an employee's expression of hostility towards another group does not qualify. And two, the social worker never sought to inform the public of anything. Rather, he kept the books secreted in his office and only ever showed them to students, alone.

Even if the social worker had met his burdens, the employer's interest in stopping discriminatory propaganda from being forced onto students in school outweighed the social worker's interests. Discriminatory propaganda which maligns a disfavored minority group should weigh nothing in the balance. By comparison, a school employer's interest in ensuring that the educational environment is free from "speech" antithetical to its mission to safeguard especially the most vulnerable students, and to foster a welcoming environment for all, dwarfs whatever interests the social worker purports to have in continuing.

## II    The employee is unlikely to succeed on a free exercise claim against his employer

The social worker has asserted many claims and arguments which seek to apply a stricter standard than any of his speech would ordinarily be due under *Pickering*. Primarily the social worker argues that he derives his anti-transgender views from his religious beliefs so that by directing him to stop spreading those views to students the employer thereby infringed on his right to religious freedom.

The employer's anti-discrimination policy did not implicate the

social worker's free exercise rights at all. The policy did not stop him from believing in or professing any religious doctrine, or from engaging in any religious practice. There is all the difference between a policy that would keep an employee from professing a religious belief itself, and one that would keep him from merely expressing views that are allegedly derived from some religious belief.

Even if it did implicate the social worker's free exercise rights, the anti-discrimination policy does not target religious beliefs, and the employer did not apply the policy to the social worker out of any hostility to religion. The social worker argues that the employer expressed hostility to his religious beliefs by concluding that the books which encapsulate his religious views were discriminatory. But expressing "hostility" towards someone's conduct is not the same thing as expressing hostility to their religion just because that conduct allegedly had a religious motivation.

Because the anti-discrimination policy and its application to the social worker was neutral with respect to religion, at most it implicated his free exercise rights only incidentally. The policy is therefore subject to mere rational-basis review or, as a claim over religious "speech," it is resolved against the social worker by *Pickering*.

The social worker also argues that the anti-discrimination policy is an impermissible viewpoint-based restriction of speech because other school staff were allowed to express the view that transgender persons

13

are not bad. However, the school staff which the opening brief identifies are not comparators because they do not work for the employer here. Regardless, the policy is a *content-based* restriction of speech because it would bar hostile expressions of animus regardless of which protected class was the target. Moreover, *Pickering* allows a viewpoint-based restriction of speech if its balancing test otherwise favors the employer.

**III      The employee is unlikely to succeed on a due process claim against his employer**

The social worker argues that the phrase "bias incident" as used in the employer's anti-discrimination policy is unconstitutionally vague. But statutes, to say nothing of a public employer's internal policies, need not define all their terms. But in fact, the anti-discrimination policy does define *bias incident*. Any reasonable person of ordinary intelligence would have understood that spreading propaganda effectively denying the existence of a disfavored minority group would be deemed a hostile expression of discriminatory animus.

## ARGUMENT AND AUTHORITY

This appeal assigns error to the district court's denial of a motion for a preliminary injunction. "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in

14

the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). The Court applies a "sliding scale" approach to evaluate motions for a preliminary injunction, "allowing a stronger showing of one element to offset a weaker showing of another." *Doe v. Snyder*, 28 F.4th 103, 111 (9th Cir. 2022).

The Court reviews the denial of a motion for a preliminary injunction for abuse of discretion. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). A district court abuses its discretion in denying such a motion if the court based that decision on an "erroneous legal standard or clearly erroneous finding of fact." *Id*. In determining whether the district court abused its discretion, the Court reviews "conclusions of law de novo and findings of fact for clear error." *Id*. The Court will not reverse where the district court "got the law right" if its factual determination were not clearly erroneous. *Id*.

**I     The district court acted within its discretion to deny the motion for a preliminary injunction because the plaintiff is not likely to succeed on his free speech claim**

The district court denied the motion for a preliminary injunction after concluding that Theis was unlikely to succeed on his free speech claim, or the other functionally duplicative claims. The court based that conclusion largely on the grounds that Theis had displayed and discussed *Johnny the Walrus*—the purported "speech" at issue—with students in his school office as a school social worker as opposed to his

15

capacity as a private citizen. That finding was correct. The court's conclusion that Theis is unlikely to succeed was correct for additional reasons, too, each explained below in the appropriate order.

**A**     ***The plaintiff, a public employee, is not likely to succeed because the defendant, his employer and a public educator, merely barred him from continuing discriminatory conduct***

An Oregon statute prohibits in education "any act that unreasonably differentiates treatment, intended or unintended, based on gender identity," among other protected traits. This same statute requires that public educators guard against discrimination by adopting policies to address "bias incidents." That phrase is defined to mean a "person's hostile expression of animus" related to a protected trait.

**1**     ***The employer barred the employee from continuing his in-school, discriminatory conduct under a policy mandated by a state law prohibiting discrimination in education***

InterMountain as a public educator has adopted the policy required by the state's anti-discrimination in education statute. This policy defines *discrimination* and *bias incidents* using language directly from the statute. InterMountain found that Theis violated its anti-discrimination policy by displaying *Johnny the Walrus* while students were in his office, and by hoping to use the book—and in fact using the book—to tell students how "transgenderism" is just an ideology and therefore that transgender persons do not really exist.

16

The opening brief repeatedly calls the anti-discrimination policy a "speech code" as if affixing that label would automatically trigger First Amendment protections. This confuses the difference between a bona fide regulation of speech, and a regulation where any effect on speech is only incidental to its primary goal.

Almost all government regulations touch on speech in some way. But governing would become impossible if regulations which only incidentally affect speech were always subject to First Amendment scrutiny. *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 958 (9th Cir. 2011) (Kozinski, J., dissenting). So a regulation cannot be avoided on free speech grounds just because its prohibited conduct might be "in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Rumsfeld v. FAIR, Inc.*, 547 U.S. 47, 62 (2006).

This basic rule applies with equal force to anti-discrimination laws. *See Wisconsin v. Mitchell*, 508 U.S. 476, 487–88 (1993) (compiling cases upholding anti-discrimination laws against First Amendment challenges). Their "focal point" is non-expressive conduct: namely, the "act of discriminating against individuals." *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston, Inc.*, 515 U.S. 557, 572 (1995). Just because proscribed discrimination might be accomplished through some form of expression—or "speech"—does not mean that an anti-discrimination law implicates the First Amendment.

17

For example, Title VI broadly prohibits "discrimination" in schools, including race-based harassment. Harassment that creates an unlawful, hostile educational environment may be accomplished through verbal or nonverbal expression, including expression directed at someone other than the complainant himself. *See Monteiro v. Tempe Union High School District*, 158 F.3d 1022, 1032–35 (9th Cir. 1998). A black student would inarguably suffer unlawful discrimination if a white teacher cornered him to explain that black people should not have been given the full panoply of civil rights, but would be better off relying on the paternalistic largess of the innately superior white race.

The teacher could not successfully defend himself on free speech grounds, even if his ideas about racial hierarchies derived from some deeper "idea or philosophy," like religion. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 390 (1992). And he certainly could not offload his culpability onto a purported children's book which cheerfully explains the phrenological basis for black inferiority. Anti-discrimination laws are not tantamount to a regulation of speech itself because otherwise they might not bar "speech" like the teacher's in the example above even though it creates a racially hostile educational environment for the black student.

**2**     ***Anti-discrimination laws or regulations do not implicate the First Amendment just because their application to bar discriminatory conduct might burden speech incidentally***

The goal of InterMountain's policy is to prevent discriminatory

18

*conduct*. To that end, it bars hostile expressions of animus based on race, among other protected traits. Just like Title VI, the policy would also bar the teacher in the example above from continuing. This would not implicate the First Amendment any more than if Title VI were the source of the prohibition. It should make no difference to this outcome if black people were swapped out with transgender people as the target of the teacher's hostile expressions of animus.

Congress enacted Title VI as part of the Civil Rights Act of 1964, a year when enough people disputed whether racial minorities should be fully equal that the issue could be politicized. Between then and now the issue has become nominally settled. Compared to 1964, whether the law should ensure that civil rights belong to all equally irrespective of race is no longer viewed as a legitimate debate and, hence, the issue is no longer politicized. Unfortunately the same cannot be said about sexual minorities. Demonizing them has lost its taboo at least in certain circles like Matt Walsh acolytes, and whether they should enjoy the full panoply of civil rights just the same as everyone else has become politicized to an extent.

Presumably Theis would agree that his speech rights would not have been implicated if he had used some purported children's book to impugn black people rather than transgender people. So his speech claim depends on the assumption that regulations which seek to prevent discriminatory conduct may be avoided on free speech grounds if it

19

has become socially acceptable to question the place in society of the targeted group. But courts do not—or at least they should not—decide whether regulations which seek to prevent discriminatory conduct may be avoided on free speech grounds depending on how politicized support for, or opposition against, a minority group has become. Otherwise courts in 1964 would have delayed enforcing Title VI in the name of "free speech" until the power of Southern segregationists, for example, waned.

InterMountain barred Theis from continuing with discriminatory *conduct* that would violate its anti-discrimination policy. Because this did not implicate the First Amendment, Theis has no likelihood of success on his free speech claim.

**B**     *Even if the First Amendment were implicated, an employer may bar discriminatory rhetoric without raising any constitutional concern deserving of further consideration*

Even if its anti-discrimination policy had implicated the First Amendment, InterMountain is a public employer, and Theis its public employee. Whether a public employer can restrict employee speech is decided by the test given by the Supreme Court in *Pickering v. Board of Education*, 391 U.S. 563 (1968), as that test has been expanded upon and clarified by several subsequent Supreme Court cases. The point of the *Pickering* balancing test—the point of all tests to decide whether and when fundamental rights can be abridged—is to weigh the

respective interests involved. A public employee "as a citizen" has speech rights. But these must be weighed against the interests of the government employer in ensuring the "effective and efficient fulfillment of its responsibilities to the public." *Connick v. Myers*, 461 U.S. 138, 151 (1983).

The test begins by asking whether the employee's speech deserves to advance to the part where the actual *balancing* occurs. To be deserving, the speech must have first been offered in the employee's capacity as a private citizen rather than as a public employee. Because if the latter, then the speech was not even the employee's own speech. Rather, it effectively belonged to the public employer, and an employer gets to control its own message. *See generally Garcetti v. Ceballos*, 547 U.S. 410 (2006).

If the employee establishes that he offered the speech in his capacity is a private citizen, then he must also establish that the speech was "on a matter of public concern." *Connick*, 461 U.S. at 145–46. This helps to ensure that federal courts are used to vindicate serious constitutional interests. The government as an employer would be paralyzed without some limits on when employees may challenge every nominal "speech" restriction. *Id*. at 147.

For the reasons below, Theis did not engage in speech that deserves to be weighed against InterMountain's interests when he displayed and discussed *Johnny the Walrus* with students in his office.

21

Theis offered those books to students in his capacity as an InterMountain employee rather than as a private citizen. Even if not, that kind of discriminatory propaganda expresses its proponent's own purely personal grievance as opposed to something that rises to the level of a public concern.

### 1 *The employee offered his discriminatory rhetoric in his capacity as a public employee, rather than as a citizen, because he tried to convey it to students in his school office*

The district court denied the motion for a preliminary injunction after finding that Theis displayed and discussed *Johnny the Walrus* with students in his office as an InterMountain employee not as a private citizen. (ER 17–21.) That finding was based on the court's application of *Johnson v. Poway Unified School District*, 658 F.3d 954 (9th Cir. 2011). That case came from a remarkably similar context. It presciently describes when a public employee—a teacher, as it happened—offers speech in that capacity as opposed to as a private citizen.

In *Johnson*, a math teacher displayed banners with religious messages in his classroom. The school district that employed the teacher made him take the banners down because they advanced a particular sectarian viewpoint, contrary to district policy. The teacher sued the school district over the banners, making a free speech claim, among others. This Court duly assessed under *Pickering* whether the teacher had displayed the banners as an employee or private citizen. That line of

22

demarcation depended on resolving whether the teacher's speech—the banners—"owed its existence to his position, or whether he spoke just as any non-employee citizen could have." *Id.* at 967.

With that conception fixing the boundary, it was easy to see on which side of the line the banners fell. "An ordinary citizen could not have walked into [the teacher's] classroom and decorated the walls as he or she saw fit." *Id.* at 968. Because his status as a public-school teacher was the only reason the plaintiff had gained access to the classroom and was able to hang the religious banners, and to keep them hung, the teacher had necessarily offered his religious "speech" as a public employee.

Moreover, the issue was not just the banners as decorations existing in a vacuum. More broadly it was what the teacher was doing with the banners. Namely, he was taking "advantage of his position to press his particular views upon the impressionable and captive minds before him." *Id.* at 968. Teachers clearly do not have a First Amendment right to teach students entrusted to their care in ways contrary to their school district's instructions. *Mayer v. Monroe County Community School Corp.*, 474 F.3d 477, 480 (7th Cir. 2007) ("The Constitution does not entitle teachers to present personal views to captive audiences against the instructions of elected officials.")

The parallels here with *Johnson* are close: if he had not been a social worker, Theis could not have somehow walked in off the street and

placed *Johnny the Walrus* for display in his office, much less kept it there indefinitely. But as in *Johnson*, the question is not about *Johnny the Walrus* as a "decoration" devoid of the context in which Theis had placed and used it. The question more specifically is whether Theis as a school social worker should be able to freely offer up the book—supposedly a children's book after all—*to students in his school office*.

Theis was admittedly trying to use *Johnny the Walrus* as a wedge through which he could force its anti-transgender message onto students. He only had access to students in a school's office because in general he worked at a school, more specifically it was the office assigned to him, and even more specifically his role as a school social worker tasked him with testing students, *in his office*. It would be hard to imagine a scenario where the speech was more clearly offered in the plaintiff's capacity as a public employee.

Yet the opening brief tries to downplay into oblivion the relevance of the fact that Theis discussed *Johnny the Walrus* with students in his office. The idea seems to be that a public employee acts as a private citizen unless the utterance itself was squarely mandated by the scope of his job duties. This allows the brief to conclude that Theis must have offered up *Johnny the Walrus* as a private citizen precisely because his job duties as a social worker do not entail spreading anti-transgender propaganda to students. (Opening Brief 29–38.)

*Johnson* anticipates this exact argument, which even one second

24

of lucid thought would reveal to be a catch-22 for public employers. As *Johnson* points out, it is not as if teachers

> cease acting as teachers each time the bell rings or the conversation moves beyond the narrow topic of curricular instruction. Rather, because of the position of trust and authority they hold and the impressionable young minds with which they interact, teachers *necessarily* act as teachers for purposes of a *Pickering* inquiry when at school or a school function, in the general presence of students, in a capacity one might reasonably view as official.
>
> *Johnson,* 658 F.3d at 967–68 (emphasis in original).

Theis' job as a school social worker involves having students in his office, and talking to them. He cannot switch hats between social worker and private citizen by changing the subject under discussion with students, especially to one which InterMountain expressly forbids. Otherwise discriminatory "speech" in the workplace would always be deemed to have been offered in a public employee's capacity as a private citizen since, by definition, it would always be outside the scope of his job duties.

Theis derives the argument here largely by taking quotes from cases like *Kennedy v. Bremerton School District*, 597 U.S. 507 (2022), out of context. According to Theis, *Kennedy* abrogates cases like *Johnson* to adopt a rule whereby public employees only speak as such when their job duties expressly mandated the challenged speech. But neither *Kennedy* nor any other cases support any rule that would allow Theis to convey any message he wants to students in his office so long as he is

25

not at that very moment actively evaluating their educational needs consistent with his job's description. As *Johnson* recognized, the analysis could never be reduced to such a simple formulation, because more broadly the question is whether a reasonable observer—like a student—could conclude from the context that the employee was acting in his official capacity.

In *Kennedy*, a school district concerned about an Establishment Clause violation disciplined a high school football coach for praying on the field after games. In assessing whether the discipline was constitutional under *Pickering*, the Supreme Court found that the coach had prayed in his capacity as a private citizen because, after games, he was effectively off the clock, and any players who remained on the field were effectively no longer students "in school." *Cf. Wood v. Florida Department of Education*, 142 F.4th 1286, 1292–93 (11th Cir. 2025) (pointing out these and other distinguishing facts in response to arguments by a teacher similar to those which Theis makes here).

Among the many obvious differences here is that Theis offered his anti-transgender views 1) in school 2) while he was on duty 3) during the school day 4) to students 5) in his school office 6) who were only there because Theis was a social worker. *Kennedy* did nothing to change *Johnson* considering their vastly different scenarios. Meanwhile, this Court has continued to approvingly cite *Johnson*. *See, e.g., Dodge v. Evergreen School District #114*, 56 F.4th 767, 777–78 (9th Cir. 2022). For

26

its part, the opening brief offers nothing but a comparison to *Kennedy* strained beyond recognition. It cites no case, whether from this Court or any other, with remotely similar facts finding that a school employee acted in anything but that capacity.

At most, *Kennedy* cautions about taking an excessively broad view of a public employee's job duties in deciding whether the speech at issue was offered in the plaintiff's capacity as a public employee or private citizen. In this regard, the brief especially takes issue with the quote from *Johnson* about teachers acting as teachers when they are "in the general presence of students." (Opening Brief 30, 35.) As if Theis had been standing on a street corner and children who happened to be students at his school somehow happened to be within earshot of his anti-transgender propaganda.

But the "presence of students" is only one of several factors which, taken together, would help to demonstrate whether a school employee was acting in a capacity another person might reasonably view as official. *Johnson*, 658 F.3d at 968 n. 15. Obviously, the district court did not base its finding that Theis had offered up *Johnny the Walrus* to students in his capacity as a school social worker just because of the "general presence of students."

For these reasons, the district court applied the correct legal standard in deciding whether Theis acted as a public employee or a private citizen. Meanwhile, its finding that Theis acted in his capacity as a

social worker when he displayed and discussed *Johnny the Walrus* with students in his school office was not clearly erroneous. In fact, it was clearly correct. The court's denial of Theis' motion for a preliminary injunction therefore may not be reversed.

**2**    ***While the plight of disfavored groups is a matter of public concern, an employee's discriminatory rhetoric against them expresses a purely personal grievance***

Theis assumes that the anti-transgender propaganda he tried spreading to students qualifies as speech on a matter of public concern. The opening brief does cite *Janus v. AFSCME, Council 31*, 585 U.S. 878, 913 (2018), to support that "controversial subjects" like "sexual orientation and gender identity" are a public concern. But that does not answer whether blatantly transphobic "speech" like *Johnny the Walrus* is a matter of public concern.

Speech addresses a matter of public as opposed to a personal interest when it related to matters of "political, social, or other concern to the community." *Lane v. Franks*, 573 U.S. 228, 241 (2014). "The focus must be upon whether the public or community is likely to be truly interested in the particular expression, or whether it is more properly viewed as essentially a private grievance." *Roe v. City & County of San Francisco*, 109 F.3d 578, 585 (9th Cir. 1997).

Undoubtedly speech *protesting* discrimination in the workplace, or speech *about* the historical plight of a disfavored minority group, or the

28

general *topic* of discrimination would qualify as speech on a matter of public concern. *See, e.g., Adams v. County of Sacramento*, 116 F.4th 1004, 1010–12 (9th Cir. 2024). But courts should not fall for the "glib assertion" that because matters of discrimination are, "at the broadest level of abstraction," issues of public concern, that discriminatory remarks "automatically qualify." *Booth v. Pasco County*, 757 F.3d 1198, 1215 n. 25 (11th Cir. 2014). "The distinction [the Court has] drawn between personal and public interest applies even against the backdrop of controversial issues like racism." *Adams*, 116 F.4th at 1011. "Taken alone," an employee's "expressed hostility towards" a group of people is not speech on a matter of public concern. *Id.* at 1012.

Another consideration is what the employee sought to accomplish. If he offered the speech in a public forum as part of an effort to "inform the public," especially on issues related to the affairs of the public employer, then the speech is more likely to be on an issue of public concern. *Connick*, 461 U.S. at 148. By contrast, when speech is directed to a limited audience, then that conclusion is less likely. *Roe*, 109 F.3d at 585.

In this schema, the plight of transgender persons is an issue of public concern. The fact that a book like *Johnny the Walrus* exists at all is an issue of public concern. Likewise, the school staff member who alerted InterMountain to *Johnny the Walrus* spoke on an issue of public concern. But it does not follow that the blatantly anti-transgender expressions of hostility in the book are, without more, an issue of public

29

concern. Perhaps it might have been a point in his favor if Theis had advertised his ardor for *Johnny the Walrus* to the public on Facebook. But as it happened, the book sat alone in Theis' office apparently unnoticed for some long period, and he only ever showed it to students, alone. Altogether, this means that Theis only ever used *Johnny the Walrus* to express his private, personal grievances against transgender persons.

**3**      ***The discriminatory rhetoric therefore does not rise to a level requiring a court to weigh the employee's speech rights against the employer's interest in preventing its spread***

Theis failed to meet his threshold burden to show that he offered *Johnny the Walrus* to students in his office as a private citizen as opposed to a public employee. Even if he had, Theis also failed to show that his anti-transgender propaganda was a matter of public concern. Because *Pickering* is a "sequential" process, his failure to satisfy either of these steps "necessarily concludes" the inquiry. *Huppert v. City of Pittsburg*, 574 F.3d 696, 703 (9th Cir. 2009). A court therefore need not proceed to balance Theis' interests in spreading anti-transgender propaganda to students against InterMountain's interests in stopping him from continuing.

**C**      ***Either way, the employer could bar the discriminatory rhetoric because its interest in stopping it outweighs the employee's interest in continuing to spread it to students***

If an employee meets his burden to show that he 1) offered the

speech in his capacity as a private citizen 2) on a matter of public concern, then 3) the burden shifts to the employer to show that it had an adequate justification for treating the employee differently from other members of the public. This last part is where the respective interests of the employee and employer are weighed in the balance. Even if Theis had met his burden, InterMountain's interests in keeping him from spreading anti-transgender propaganda vastly outweigh whatever interest he may purport to have in continuing with his efforts.

1     *Under the* **Pickering** *balancing test, discriminatory rhetoric which maligns a disfavored, minority group weighs nothing because it has no legitimate, social value worth considering*

Not all speech of a public concern is treated equally under *Pickering*. Rather, there is a sliding scale for how much weight to give speech when balancing the respective interests involved. *See*, *e.g.*, *Moser v. Las Vegas Metropolitan Police Department*, 984 F.3d 900, 905, 907 (9th Cir. 2021). The heavier the speech, the more the employer's justification must weigh before the restriction is permissible. *Connick*, 461 U.S. at 152. The converse is necessarily true: the lighter the speech, the lesser the employer's burden before the scale tips in its favor. *Blackman v. New York City Transit Authority*, 491 F.3d 95, 99 (2d Cir. 2007).

The kind of speech that weighs the most is usually speech "addressing problems at the government agency where the employee works," or other speech which is similarly more substantive, like speech

31

on public affairs. *Moser*, 984 F.3d at 906. Conversely, speech weighs less when it belongs to a "less serious, portentous, political, significant [] genre of expression." *Eberhardt v. O'Malley*, 17 F.3d 1023, 1026 (7th Cir. 1994) (Posner, J.). For example, even though it is artistic expression of a sort, performing in blackface carries little weight. *Berger v. Battaglia*, 779 F.2d 992, 999 (4th Cir. 1985). Lighter still are "racially charged comments that have no connection to the government employee's workplace." *Moser*, 984 F.3d at 907.

Courts also consider the time, place, and manner of the employee's speech—its form—and the broader context. *Connick*, 461 U.S. at 152. Often speech claims against public employers involve a scenario where the employer has restricted speech which originates outside the office, when the employee is off duty. (Social media is a common source of restricted, employee speech.) Typically in this scenario the employer must meet a higher burden under *Pickering*. Conversely, the employer's burden is usually less when the employee's speech originates from the workplace itself. *Id*.

The opening brief makes no effort to argue how much Theis' "speech" should weigh in the balance. But the analysis here is not that much different than the analysis above explaining that Theis did not offer speech on an issue of public concern when he displayed and discussed *Johnny the Walrus* with students in his office. Even if Theis and

his book managed to cross the threshold into the realm of an issue of public concern, it would only be just barely.

The book itself as a purported children's book written at what must be a first-grade level is trifling whatever its topic. And of course the topic itself has no legitimate, social value. Anti-transgender propaganda should carry no weight even if *Johnny the Walrus* were a substantial tome. Finally there is the context: Theis secreted the book in his office, only bringing it out when he could take advantage of his position as a school social worker to show it to captive students.

**2      *The employer's interests in restricting "speech" antithetical to its mission to welcome and safeguard all students vastly outweighs the employee's interests in continuing to use it***

The opening brief argues that InterMountain could only stop Theis from spreading anti-transgender propaganda to students in school if it proved sufficiently disruptive to the *workplace*. And in that regard, the brief continues, InterMountain failed to demonstrate a disruption to the workplace big enough to justify the "speech" restriction since only one school staff member complained about *Johnny the Walrus*. (Opening Brief 41–43.) This misses the point entirely. A public educator cannot be forced to tolerate an employee's blatantly discriminatory messages—*conveyed to students in school*—antithetical to its mission to safeguard especially the most vulnerable students, and to foster a welcoming environment for all.

33

Many cases do focus on the speech's actual or potential to disrupt the working relationship between coworkers, or superiors and their subordinates. While that might be one consideration here, far more important is the disruption resulting to the *educational environment* when discriminatory messages are thrust into it by a school social worker. The opening brief does cite a few cases arising from school districts. (Opening Brief 38–43.) But none are particularly relevant, because none ask whether a public educator may stop an employee from forcing a discriminatory message about a disfavored minority group *onto students in school*.

There are frankly no cases truly analogous, because as in *Johnson*, courts do not find that someone like Theis would have offered his "speech" in his capacity as a private citizen in the first place. The closest analogy would be something like *Craig v. Rich Township High School District 227*, 736 F.3d 1110 (7th Cir. 2013). In that case, a high school counselor published a book, *It's Her Fault*. It nominally offered relationship advice, but was deeply misogynistic, and it grossly objectified women as sexual objects. In short, the book was sexist.

The school district employer found out about the counselor's book and fired him for violating its policy "prohibiting conduct that creates an intimidating, hostile, or offensive educational environment." *Id*. at 1113–15. The counselor asserted a free speech claim. He had written and published the book at home on his own time, so he had acted as a

private citizen. And the court found that the book covered a topic of public concern—relationships—but only just barely. Because the counselor's "speech interest" only had "minimal weight," the school district had a correspondingly light burden. *Id.* at 1120–21.

The court began by observing how his role conferred upon the counselor "an inordinate amount of trust" by the families of students, "and authority" over the students themselves. *Id.* at 1119; *cf. Melzer v. Board of Education*, 336 F.3d 185, 198 (2d Cir. 2003) ("We note that we conduct our evaluation of appellant's rights versus governmental interest bearing in mind his position as a teacher in a public school. This position by its very nature requires a degree of public trust not found in many other positions of public employment."). Like everyone who works at a school, the counselor was charged with the responsibility of maintaining a safe, appropriate educational environment for all students, including the ones he was supposed to serve directly.

The problem with the book was that at the very least it impeded his job. It was easy to see, for example, how female students might be uncomfortable in seeking the counselor's advice, or even visiting his office, and so on. Thus, the court held, the school district had an interest in firing the counselor "to ensure [the] effective delivery of counseling services to female students" at the counselor's school. *Craig*, 736 F.3d at 1120. This and other interests the school district had in "protecting the integrity of the counseling services" at the school "dwarfed" the

35

counselor's interests in publishing *It's Her Fault*. *Id*. This same rationale applies here as much as Theis tries to diminish his role in the schools to be that of a mere "evaluator." (Opening Brief 31.)

He nonetheless evaluates students and their educational needs in his office as a school social worker. The effectiveness of the schools he serves in evaluating the educational needs of their students would certainly be diminished if transgender students, or those questioning their gender identity, or students who have transgender friends, or those who know that bigots should be avoided, would be forced to sit for evaluations with Theis and be subjected to *Johnny the Walrus*. In fact, the schools' effectiveness would be diminished even if students had only concluded, by the book's mere presence, that the schools condoned it and its message.

Moreover, the question is not just about whether Theis could continue to be an effective school social worker despite *Johnny the Walrus*. Allowing discriminatory messages to proliferate affects the entire community of students, and the school environment as a whole. This is why the state legislature deemed it necessary to not only prohibit discrimination in education, but to require public educators to have policies addressing bias incidents.

The brief claims that *Johnny the Walrus* does "not even address transgender issues, much less demean or attack anyone." (Opening Brief 39). This would only be true for someone who does not understand how

36

metaphors work. The sole point *Johnny the Walrus* makes is that someone is transgender only because they have either succumbed to ideology or mental illness. Besides that, the opening brief, focused as it is on *workplace* disruptions, has almost nothing to say about disruptions on the *educational environment* except to unthinkingly deny them.

For the reasons given above, InterMountain's application of its anti-discrimination policy to bar Theis from continuing to display and discuss *Johnny the Walrus* with students did not implicate the First Amendment at all. Even if it did, Theis offered his "speech" as InterMountain's employee rather than as a private citizen, and it expressed a Theis' own private grievance about a group he disfavors rather than a matter of public concern. For any of these reasons, Theis' speech claim does not even proceed to the part of *Pickering* where the "balancing" occurs. Even if the claim would proceed that far, InterMountain's interests as a public educator in keeping Theis from spreading anti-transgender propaganda to a young, captive audience vastly outweighs whatever interests he might purport to have in continuing to do it.

## II  Whether the employee had a right to continue with his discriminatory rhetoric cannot be evaluated under any standard stricter than the *Pickering* balancing test

The opening brief spends much of its space arguing that InterMountain could only bar Theis from spreading anti-transgender propaganda to students in his office if it could satisfy a stricter standard than

37

the one supplied by *Pickering*. The opening brief gives two rationales for why some stricter standard should apply to save Theis' wish to continue forcing his views on students. First, that barring him from continuing would infringe on his rights to religious freedom. Second, that it would be tantamount to an impermissible viewpoint-based restriction of speech. Neither of these rationales has any merit. Each is based on errors of the law, the facts, or both. For the reasons explained below, there is no scenario where Theis would be entitled to have his interests given more weight than they would ordinarily be due under *Pickering*.

**A**     ***Discriminatory rhetoric cannot be excused by an employee's free exercise rights just because his discriminatory views about a disfavored group derive from his religious beliefs***

The complaint asserts a free exercise claim based on allegations that Theis derives his anti-transgender views from his religious beliefs, and that by barring Theis from displaying or discussing *Johnny the Walrus* with students InterMountain thereby infringed on his right to religious freedom. (ER 213–15.) The district court denied the motion for a preliminary injunction after finding that Theis was no more likely to succeed on this free exercise claim than he was on the free speech claim. (ER 24–26.) The court based that finding after applying the rule from *Employment Division v. Smith*, 494 U.S. 872 (1990).

The plaintiffs in *Smith* challenged on free exercise grounds a law which, in its effect, barred them from using a drug for a religious

ceremony. The Court began by observing how free exercise rights do not "relieve an individual of the obligation to comply with a valid and neutral law of general applicability" just because it "proscribes (or prescribes) conduct that his religious prescribes (or proscribes)." *Id*. at 879. The Free Exercise Clause therefore did not keep the law, neutral and generally applicable, from barring the plaintiffs from taking illicit drugs even though its "incidental effect" was to burden a religious practice. *Id*. at 878–79.

Here, the district court held that Theis could not use his supposed religious beliefs to escape InterMountain's anti-discrimination policy. As in *Smith*, the court found that the policy was neutral, generally applicable, and was not applied with any hostility towards religion. That holding and the findings on which it is based are clearly correct. More to the point, the district court did not abuse its discretion in denying the preliminary injunction because it did not resolve the free exercise claim by relying on either an erroneous legal standard or a clearly erroneous finding of fact.

### 1    *Barring the employee from spreading discriminatory rhetoric to students did not implicate the Free Exercise Clause because it did not burden any religious practice*

The Free Exercise Clause is not a general protection of religion or religious beliefs. Rather, it protects against the government from "prohibiting the free exercise" of religion. Not everything done with a

39

religious motivation counts as the "exercise of religion." Rather, the exercise of religion includes believing in or professing a religious doctrine, or observing a religious practice. So before government action implicates the Free Exercise Clause at all, it must have kept the plaintiff from either believing in or professing a religious doctrine, or observing a religious practice. *Id.* at 877; *American Family Association, Inc. v. City and County of San Francisco*, 277 F.3d 1114, 1123–24 (9th Cir. 2002).

Despite the many pages it spends on the free exercise claim, the opening brief takes for granted that Theis has satisfied this most basic element. Just because Theis allegedly derives his anti-transgender views from his religious beliefs does not mean that a directive barring him from spreading those views to students somehow counts as a regulation of the underlying beliefs themselves or, as in *Smith*, a regulation that burdens a religious practice. In other words, it does not mean that InterMountain's anti-discrimination policy effectively prohibited Theis from the free exercise of his religion.

*Olympus Spa v. Armstrong*, 138 F.4th 1204 (9th Cir. 2025), illustrates the point. In that case, a spa had a policy that granted entry to only "biological women," thereby excluding preoperative transgender women. A state agency instituted an enforcement action against the spa under a state law which prohibited discrimination in places of public accommodation. The agency found that the entrance policy violated the law, and ordered the spa to rescind it. *Id*. at 1212–13.

40

The spa claimed that the state law effectively deprived it of its free exercise rights because it required the spa "to renounce its Christian faith…by permitting the mixing of nude persons of the opposite sex who are not married to one another." *Id.* at 1218. This Court pointed out the flaw in the reasoning: while the spa's religious beliefs may have motivated its exclusionary policy, it does not follow that the public accommodations law worked to prohibit the spa from believing in or expressing its religious beliefs, or to refrain from any religious practice itself. *Id.* In sum, the spa was "hard pressed to identify how the [law] regulates its beliefs." *Id.*

Theis makes no effort to explain how InterMountain's anti-discrimination policy would effectively prohibit him from believing in or professing a religious belief, or from engaging in a religious practice. Presumably spreading anti-transgender propaganda to students is not required as part of any religious ceremony. Meanwhile, on its face the anti-discrimination policy does not regulate any religious beliefs in and of themselves. Does the policy prohibit Theis from professing any religious doctrines?

This only seems like a closer question. But there is all the difference between a regulation that keeps a plaintiff from professing a religious doctrine itself, and one that keeps a plaintiff from "expressing," as the complaint alleges, views that are "consistent with" that religious doctrine. (ER 214.) There are no cases holding that a standard anti-

discrimination regulation like the one here would even incidentally affect a plaintiff's religious beliefs just because his discriminatory views had some religious basis. Because Theis has not even tried to establish that InterMountain's anti-discrimination policy qualified as government action *prohibiting* him from the free exercise of his religion, the claim deserves no further attention.

**2    *Regardless, the employee cannot cite his religion to avoid the anti-discrimination policy since it is neutral, generally applicable, and was not applied with any religious hostility***

Even if Theis had properly shown that InterMountain had prohibited the free exercise of his religion, he still could not use the Free Exercise Clause to override the anti-discrimination policy, or its application to bar him from spreading Matt Walsh's propaganda to students. If a challenged regulation is neutral and generally applicable then, as in *Smith*, the burdens it places on a plaintiff's religious beliefs or practices are considered merely "incidental" to the regulation. These burdens are allowed if the regulation satisfies a rational-basis review.

A challenged regulation is neutral with respect to religion when it does not aim to restrict or burden any religious beliefs or practices. *See Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1076–82 (9th Cir. 2015) (describing what qualifies as a neutral, generally applicable law). The anti-discrimination policy is, obviously, facially neutral with respect to religion. But even a regulation neutral on its face may fail the neutrality

42

test if it was enacted with the goal of suppressing religious beliefs or practices, or if its real-world application reveals a clear pattern of using the regulation to effectively accomplish that same goal. *Parents for Privacy v. Barr*, 949 F.3d 1210, 1235 (9th Cir. 2020).

There is no evidence or even an allegation that Oregon's legislature enacted the anti-discrimination in education law, or that Inter-Mountain adopted the anti-discrimination policy which that law mandates, with the goal of targeting any religious beliefs or practices. Likewise, there is no evidence or even allegation that InterMountain has historically used the policy in any way that evinces some sort of anti-religious agenda. That ends the inquiry into whether the anti-discrimination policy was neutral with respect to religion. *See, e.g., Tingley v. Ferguson*, 47 F.4th 1055, 1085 (9th Cir. 2022) (finding a law prohibiting "sexual orientation change efforts" neutral because the legislature did not enact it with the goal of targeting religion); *Welch v. Brown*, 834 F.3d 1041, 1047 (9th Cir. 2016) (similar).

A challenged regulation is not "generally applicable" if it seeks, either facially or operationally, to restrict or impose burdens on conduct motivated by religious beliefs but not comparable, secular conduct that threatens the same governmental interest. *Parents for Privacy*, 949 F.3d at 1235–36; *Stormans, Inc.*, 794 F.3d at 1076–82. Again, there are no allegations and there is nothing in the record about how the state anti-discrimination in education law has historically been applied. Likewise

43

there is nothing about how InterMountain has applied the anti-discrimination policy aside from Theis' own example.

When the government has burdened the free exercise of religion through a regulation that *does* target religious beliefs or practices, then the regulation is only permissible if it is narrowly tailored to accomplish a compelling governmental interest. *See Smith,* 494 U.S. at 882–89. Theis puts his efforts into a free exercise claim to enable the argument that InterMountain's anti-discrimination policy cannot keep him from displaying or discussing *Johnny the Walrus* with students in his office because it is subject to, and fails, this strict-scrutiny standard of review. (Opening Brief 43–52.)

To that end, the brief includes some cursory arguments about how the policy is not neutral and generally applicable. But these are misconceived, because they only address how InterMountain applied the policy to Theis and his conduct. The sole argument the opening brief really intends to make is that InterMountain directed Theis to stop displaying and discussing *Johnny the Walrus* out of some hostility to his religious beliefs.

The brief takes its cue here from *Masterpiece Cakeshop v. Colorado Civil Rights Commission*, 584 U.S. 617 (2018). In that case, a baker refused to bake a cake for a same-sex wedding because of some religious belief against same-sex marriage. An administrative tribunal found that the baker's refusal had violated a state anti-discrimination law. The

44

Court found that the tribunal's findings infringed on the baker's free exercise rights, but only because beforehand the tribunal's members had "expressed clear and impermissible hostility" towards the baker's religious beliefs. *Id.* at 635. For example, someone had remarked how his beliefs were no different than those which had "been used to justify all kinds of discrimination throughout history, whether it be slavery, [or] the holocaust." *Id.*

Theis identified no comments like this. Literally the only examples he musters as evidence of InterMountain's supposed religious hostility are instances where it explained to Theis that his use of *Johnny the Walrus* with students violated its policy. The argument, in other words, begins with the premises that Theis derives his anti-transgender views from his religious beliefs, and that the *Johnny the Walrus* encapsulates those views. He concludes that InterMountain demonstrated hostility to his religious beliefs in finding *Johnny the Walrus* to be blatantly transphobic. (Opening Brief 44–45.) That is not even a logically valid argument. Expressing "hostility" towards someone's beliefs is not the same thing as expressing hostility to their religion just because the beliefs allegedly had a religious motivation.

The district court found that Theis had failed to show that InterMountain had directed him to stop trying to spread anti-transgender rhetoric because of any hostility towards his religious beliefs. (ER 27.) This factual finding was correct. In any event, the standard of review is

clear error, and the district court's finding that InterMountain had not acted out of any religious hostility was not clearly erroneous.

**3**     *Even if the employee had a viable free exercise claim, it would be easily resolved against him following a rational-basis review, or through the* **Pickering** *balancing test*

The district court rightly found that Theis had displayed and discussed *Johnny the Walrus* in his capacity as InterMountain's employee. That finding means that the "speech" on which Theis has based his claims was effectively InterMountain's own so that neither the Free Speech nor the Free Exercise clauses of the First Amendment were even implicated to begin with. *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009). But even if the Free Exercise Clause were implicated, the anti-discrimination policy *at most* burdened Theis' religious beliefs or practices only incidentally.

In a free exercise analysis, the policy is therefore subject to a rational basis review. Under that standard, the policy will be upheld so long as it was "rationally related to a legitimate government purpose." *Parents for Privacy*, 949 F.3d at 1238. Trying to curtail discrimination, and safeguarding the well-being of children, are unquestionably not just legitimate, but compelling, interests the government may seek to advance. *See, e.g.*, *Roberts v. U.S. Jaycees*, 468 U.S. 609, 624 (1984); *New York v. Ferber,* 458 U.S. 747, 756–57 (1982). In that regard, this Court has held that "eliminating discrimination on the basis of sex and

46

transgender status" is a legitimate goal, and that anti-discrimination regulations are generally "rationally related" to the elimination of discrimination. *Olympus Spa*, 138 F.4th at 1218–20; *Parents for Privacy*, 949 F.3d at 1238–39.

Theis makes no effort to argue why InterMountain's anti-discrimination policy would not be upheld in a rational-basis review. Rather, he uses *Kennedy v. Bremerton School District* to argue for a strict-scrutiny standard of review. As described above, in that case a school district concerned about an Establishment Clause violation disciplined a football coach for praying on the field after a game.

The Court began by assessing the discipline under the typical *Pickering* framework. In doing so, it concluded that the coach's prayer qualified as 1) speech by a private citizen 2) on a matter of public concern. *Kennedy*, 597 U.S. at 527–32. From there, the Court held, the discipline was only permissible if it satisfied some standard higher than the more "lenient" one that would ordinarily have applied under *Pickering*. *Id.* at 532. Theis characterizes the Court as having held that a stricter standard applied essentially because religion was involved. (Opening Brief 43–49.)

That is not what happened. Though the Court began with the *Pickering* standard, the Court departed from it for two reasons. One, the school district had specifically prohibited the coach from *praying*, the archetypal religious practice. And two, the discipline was not neutral with

47

respect to religion. The discipline had expressly—and admittedly—targeted the coach's "religious conduct because the conduct was religious." *Id*. at 523. From there, the Court held that the discipline was not permissible regardless of the standard of review because the school district's concerns about an Establishment Clause violation were wholly misplaced. *Id*. at 532–43.

Here, by contrast, InterMountain's anti-discrimination policy did not specifically prohibit any of Theis' religious beliefs or practices. In fact the policy did not burden them all. But even if it had, religion was not the policy's target. The policy would have barred Theis from continuing with his anti-transgender propaganda just the same regardless of whether he had a religious motivation. Therefore, any burden the policy placed on Theis' religious beliefs or practices was at most incidental to its goal of eliminating discrimination.

In *Berry v. Department of Social Services*, 447 F.3d 642 (9th Cir. 2006), a public employee asserted a free exercise claim after his public employer prohibited him from displaying "religious items" in his cubicle—like a Bible—at least when clients were present. The employee argued for a "stricter test" than *Pickering* because "religious speech" was involved. The court declined, holding that *Pickering* resolved the employee's free exercise claim because it was intended to apply to all restrictions on a public employee's speech, including nominally religious speech. *Id*. at 648–49.

The opening brief argues that *Kennedy* overruled *Berry*. (Opening Brief 48.) *Kennedy* could be read as implicitly doing so, but only if a public employer specifically prohibited an employee's religious practice, by expressly targeting it because the practice was religious, in a scenario where the employee engaged in that practice as a private citizen. Theis has established exactly none of this.

Ultimately the free exercise claim does not get Theis to somewhere he could not go in his free speech claim. The free exercise claim leads to only three possible outcomes, each well short of strict scrutiny. One, the claim does not even get out of the garage because InterMountain's anti-discrimination policy did not burden any religious belief or practice even incidentally. Two, because the policy does not target religion, a free exercise claim treated as such would be resolved by rational-basis review, which is *more* lenient than *Pickering*. Or three, the claim is simply resolved by *Pickering* as happened in *Berry* because most fundamentally it challenges a restriction of a public employee's "speech." *Pickering* applies because it is the designated test to resolve a speech claim asserted by a public employee against his public employer, including speech with a purported religious motivation.

In sum, Theis is not entitled to have the question of whether Inter-Mountain could bar him from spreading anti-transgender propaganda to students in his office under some higher level of scrutiny than *Pickering* even if he had some religious motivation.

**B** ***Discriminatory rhetoric against a disfavored group cannot be excused just because a public employer would not bar other employees from supporting that group***

When InterMountain directed Theis to stop spreading anti-transgender propaganda to students, he protested that the schools in which he worked allowed their staff to display material conveying the message that transgender persons have a right to exist and enjoy the same civil rights as anyone else. In turn, the complaint asserts an equal protection claim based on allegations that InterMountain directed Theis to stop expressing "views regarding gender identity" but did not, at the same time, "punish employees who expressed opposite views on the same subject." (*See*, *e.g.*, ER 185–88, 218–19.)

When a government regulation treats speech differently because of its viewpoint, this may give rise to an equal protection claim in addition to a speech claim. *See generally Police Department of Chicago v. Mosley*, 408 U.S. 92 (1972). But First Amendment principals would still "underlie" the claim, *R.A.V.*, 505 U.S. at 384 n. 4, and courts would still "employ essentially the same analysis" as they would in a speech claim, *Dariano v. Morgan Hill Unified School District*, 767 F.3d 764, 779–80 (9th Cir. 2014) (applying the *Tinker* standard to an equal protection claim involving a restriction of student speech).

There is no scenario where a public employee's speech claim would be resolved by *Pickering*, but an equal protection claim based on the same set of facts would be resolved by something else. The district court

50

rejected the equal protection claim because it was synonymous with the speech claim, and would be resolved against Theis by *Pickering*. (ER 28–29.) The opening brief does not challenge this outcome.

### 1   *The employee never identified other, similarly situated employees whom the employer treated more favorably by allowing them to impugn other disfavored groups*

However, the opening brief continues with the allegations which supported the equal protection claim. Throughout its entire length, the brief repeatedly alleges that InterMountain let other employees "decorate their workspaces" with items like books which express the sentiment that discrimination, including against transgender persons, is bad. (*See, e.g.*, Opening Brief 3, 8–9, 20, 24, 26–27, 31–32, 39–40, 45, 54.) Like the free exercise claim, these allegations support an argument whose aim is to subject the anti-discrimination policy to a higher level of scrutiny than *Pickering*.

Interspersed throughout the opening brief are references to InterMountain's alleged "viewpoint" restriction of speech. (*See, e.g.*, Opening Brief 1, 3, 5, 18–19, 26, 36, 38, 46, 51.) The idea seems to be that InterMountain practiced a viewpoint-based restriction of speech because it barred Theis from using *Johnny the Walrus*, but allowed school staff to express the "opposite" message of acceptance. The government normally cannot restrict speech because of its viewpoint without satisfying a high standard. Legions of cases say this, and the opening brief cites slew of

51

them. But like the free exercise claim, the specter of a viewpoint restriction of speech the opening brief raises gets Theis no closer toward some standard stricter than *Pickering*.

The problem is: the school staff who were allowed to "decorate their workplaces" *are not InterMountain employees*. Rather, they are employed by whatever school district operates the schools in question. (ER 4.) As Theis should very well know as a 17-year InterMountain employee. How these school district employers treat their own employees cannot figure into any claim which Theis has asserted against his employer, InterMountain. True comparators could only come from the pool of InterMountain employees. But neither the complaint nor the record below say anything whatsoever about whether InterMountain let its employees decorate their workspaces with messages saying that discrimination is bad, that tolerance and equity is good, or that someone who is transgender deserves to exist.

### 2 *Even if he did, an employee's constitutional challenge to a public employer's alleged differential treatment of his speech cannot be decided under any test besides* Pickering

Theis could not have his speech claim resolved by anything besides *Pickering* for two other reasons. First, the anti-discrimination policy does not restrict speech because of its viewpoint. The opening brief argues otherwise because the policy bars hostile expressions of animus based on the target's membership in a protected class but not, as it

52

were, hospitable expressions of amity if favor of that same, protected class.

That describes a *content-based* restriction of speech, not a *viewpoint-based* restriction, because it would bar all hostile expressions of animus regardless of the target. *See R.A.V.*, 505 U.S. at 391 (explaining that a ban on "odious racial epithets" by "proponents of all views" constitutes a content-based regulation of speech). A viewpoint-based distinction would be one that barred hostile expressions of animus against only *some* protected classes. *Id*. (explaining that a ban on the use of racial slurs by one group of speakers but not "those speakers' opponents" would be a viewpoint-based regulation of speech).

Imagine that a teacher showed students a purported children's book—*Mary the Whale*—which conveyed a message through some inane allegory about a girl pretending to be a whale that people only become cisgender after they have been afflicted with a mental illness. And that the teacher used this book to spark discussions with students in his classroom about why cisgender people should not enjoy the same civil rights as everyone else.

An anti-discrimination policy which barred *Johnny the Walrus* but not *Mary the Whale* would be an example of a policy restricting speech because of its viewpoint. Theis makes no allegations or argument about whether any school staff were allowed to spread discriminatory propaganda about some group of people other than the one he would like to

53

continue impugning. By contrast, InterMountain's anti-discrimination policy is a content-based restriction of speech because it would bar the teacher from displaying and using *Mary the Whale* with students in his classroom just the same as it barred Theis from displaying and using *Johnny the Walrus* with students in his office.

The second reason Theis cannot avoid *Pickering* by raising a viewpoint-based restriction of speech is that its balancing test contemplates viewpoint-based restrictions. Both *Pickering* and its close cousin, *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1968), allow an employer or a school to restrict employee or student speech, respectively, even because of the viewpoint. *See, e.g., Damiano v. Grants Pass School District No. 7*, 140 F.4th 1117, 1149 (9th Cir. 2025) (observing that both "content- and viewpoint-based discrimination claims are subject to the *Pickering* analysis"); *Dariano*, 767 F.3d at 780 (applying *Tinker* to a viewpoint-based restriction of speech); *Berry*, 447 F.3d at 650–51 (applying *Pickering* to a viewpoint-based restriction of speech). Thus a public employer may restrict employee speech, even if doing so would constitute a viewpoint-based restriction, if *Pickering* were otherwise satisfied.

In sum, Theis is not entitled to have the question of whether Inter-Mountain could bar him from spreading anti-transgender propaganda to students in his office under some higher level of scrutiny than

*Pickering* just because InterMountain allegedly would not bar its employees from expressing support for transgender persons.

### III     The employee cannot use due process to escape the employer's anti-discrimination policy by feigning ignorance about what constitutes discrimination

The complaint asserts a due process claim. (ER 217–18.) Under InterMountain's anti-discrimination policy, a prohibited "bias incident" is defined to mean a "hostile expression of animus" related to traits, like gender identity, that are protected by law. The complaint alleges that the phrase *bias incident* is unconstitutionally vague even though the policy itself defines what it means. The opening brief continues with these allegations by arguing that Theis had no way to know, unless InterMountain had specifically told him, that "expressing a binary view of gender" would constitute a bias incident violating the anti-discrimination policy. (Opening Brief 52–55.)

InterMountain never disciplined Theis for violating the anti-discrimination policy. Rather, the district merely directed him to stop trying to spread anti-transgender propaganda to students in his office because it would deem that to violate the policy. So in fact, InterMountain did specifically tell Theis that further attempts to spread his anti-transgender views among students would constitute a bias incident in violation of its anti-discrimination policy.

In any event, one possible due process concern raised by vague

laws is that they may fail to give "fair notice" of what conduct is being proscribed. *Groyned v. City of Rockford*, 408 U.S. 104, 108–09 (1972) (giving the general standard for determining whether a law is unconstitutionally vague). The degree of vagueness allowed of laws before it raises a due process concern varies by the nature of law at issue. Some areas of law permit more vagueness because of the subject matter involved, or because the penalties for a violation are civil rather than criminal. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497–99 (1982). But in general, not even statutes need to define every term to survive a void-for-vagueness challenge. *Broadrick v. Oklahoma*, 413 U.S. 601, 607–08 (1973).

At the furthest end of the spectrum on the degree of vagueness allowed are a public employer's internal policies regulating its own employees' conduct, which of course are not laws. In contrast to the relationship between the government and its subjects, a public employer's relationship to its employees is not legalistic. Therefore, a public employer's policies governing employee conduct "need not be as clear" as civil laws, much less criminal laws. *Brown v. Chicago Board of Education*, 824 F.3d 713, 717 (7th Cir. 2016) (addressing an employer's prohibition of "racial epithets"); *cf. Bethel School District No. 403 v. Fraser*, 478 U.S. 675, 686 (1986) (observing that the imprecision and any resulting discretion afforded by school policies governing student conduct is necessary, even desirable, and certainly acceptable).

There are innumerable examples of public employees failing to escape the requirements of their employers' policies through a void-for-vagueness challenge of even *undefined* terms or phrases. For example, courts have found no issue with policies prohibiting employee "misconduct," "immorality," or "conduct unbecoming," or prohibiting employees from using "racial epithets," or being "rude to customers," or engaging in "harassment," and so on. *See, e.g.*, *Arnett v. Kennedy*, 416 U.S. 134, 161–62 (1974); *Brown*, 824 F.3d at 717; *Greer v. Amesqua*, 212 F.3d 358, 369 (7th Cir. 2000). What these and other cases all have in common is that they hold, in one way or another, that a public employer's policies outlining inappropriate or prohibited conduct can be written in "general language." *Greer*, 212 F.3d at 369.

Theis argues that he cannot even understand the policy's given definition of a *bias incident*. Who among us, he wonders, could he ever possibly have understood that spreading propaganda saying that a disfavored minority group is mentally ill would be considered a hostile expression of discriminatory animus? Fortunately, courts do not assess whether an employer's policy provides its employees with fair notice from the point of view of the impossibly stupid or the willfully ignorant. The standard is a reasonable person of ordinary intelligence. *United States v. Williams*, 553 U.S. 285, 304 (2008). Whether the level of reasonableness or intelligence Theis himself possesses falls short of even ordinary is not a consideration.

The opening brief also argues that Theis should be excused from following the anti-discrimination policy because the schools he serves "teach students" the same "binary view of gender" behind *Johnny the Walrus*. The idea being that the schools seemingly contradict the policy, causing Theis to be confused about what it prohibits. But as explained, InterMountain does not run or control these schools, so whatever they might teach does not figure into whether Theis should be confused about InterMountain's policy. Though in fact the schools do not teach students a "binary view of gender."

For support, Theis cites what looks to be a worksheet for what looks like a 6th grade biology class. (ER 283–90.) In part this teaches that secondary-sex characteristics are tied to a person's biological sex at birth, which in turn is determined by either the XX or the XY chromosome pairing. Not even biological sex is this binary. There are all kinds of exceptions to the simple XX or XY determination of sex, though these complications departing from the basic lesson probably would not be taught to students until later.

But the important point is that sex and gender though correlated are not synonyms. Gender is culturally determined. It mostly corresponds with sex at birth, but not always. Even then gender exists along a continuum. So the lesson plan does not provide some sort of scientific basis for *Johnny the Walrus* and its conclusion that transgender persons only exist insofar as they have been duped by transgender ideology, and

it should not confuse Theis about whether the policy would prohibit him from trying to spread anti-transgender propaganda to students in his office.

## CONCLUSION

For the reasons given above, the plaintiff is not likely to succeed on the merits. The Court should therefore affirm the district court's order denying the plaintiff's motion for a preliminary injunction.

Dated December 1, 2025 s/ *Blake H. Fry*
       Janet M. Schroer
       Blake H. Fry
       HART WAGNER LLP
       Attorneys for Defendants-Appellees

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1      This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because this brief contains 13,960 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in 14-point Century Schoolbook, a proportionally spaced typeface.

Dated December 1, 2025          s/ *Blake H. Fry*
                                Janet M. Schroer
                                Blake H. Fry
                                HART WAGNER LLP
                                Attorneys for Defendants-Appellees